Filed 5/27/21  P. v. Ford CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KEVIN THOMAS FORD,<br><br>    Defendant and Appellant. | D077016<br><br><br>(Super. Ct. No. SCD277479) |

APPEAL from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge.  Affirmed as modified.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting, and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

In 1987, a caregiver found the body of a 79-year-old woman on the floor of her cottage bedroom.  It appeared from the state in which the woman's body and belongings were discovered that her home had been burglarized,

and she had been raped and killed. A homicide team collected forensic and biological evidence, including a vaginal swab which revealed full, intact spermatozoa. However, the original investigation yielded no productive leads, and the case went cold. It was later reopened, and in 2018, a latent fingerprint lifted from the scene of the homicide was entered in a national automated database and was determined to match fingerprints taken from Kevin Thomas Ford, who had been arrested in 2015 for a minor offense. Ford's DNA sample was then procured pursuant to a search warrant and was determined to match the DNA in the sperm extracted from the victim.

Ford was charged with the first-degree murder of the decedent. (Pen. Code,[1] § 187, subd. (a).) A jury convicted him of this offense and found true special circumstance allegations that Ford committed the murder while engaged in the commission or attempted commission of the crimes of rape and burglary. (§ 190.2, subd. (a)(17).) He was sentenced to life in prison without the possibility of parole.

On appeal, Ford challenges the sufficiency of the evidence to support the jury's determination that he acted with the specific intent to kill, which was an element of felony murder under the law in effect when the crime was committed. Ford also disputes certain sentencing decisions made by the trial court, in particular: (1) the court's refusal to grant him presentence custody or conduct credits; (2) the court's imposition of a statutory minimum restitution fine that was higher than the statutory minimum restitution fine in 1987; and (3) the court's imposition of a parole revocation fine, notwithstanding his ineligibility for parole.

---

[1] Further unspecified statutory references are to the Penal Code, unless otherwise indicated.

2

We find merit in Ford's challenges to the court's sentencing decisions and modify the judgment accordingly. We otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND[2]

A.    *Prosecution Case*

1.    *The Discovery of the Offense*

In May 1987, Grace H. was 79 years old. She lived alone in a one-bedroom cottage in the North Park neighborhood of San Diego.

Grace was visited regularly by professional caregivers—including a social worker, Betty B.—and would leave the back door of the cottage unlocked so they could let themselves in. Grace was in declining health. She was recovering from eye surgery and cancer. Her mobility was poor; she owned several walkers and canes, and would use them when moving about the house. She suffered from pain and had been prescribed pain medication. An apparatus affixed to the headboard of her bed supported a triangle-shaped handle that Grace would grasp when adjusting her position in bed. Betty testified that when Grace would pull herself up by this handle, she would grimace in pain.

Although Grace owned a car, by May 1987 she was no longer able to drive. She used the services of a professional medical transport company, Wheelchair Transport, to get to and from her medical appointments.

On May 20, 1987, one of Grace's caregivers discovered Grace's dead body on the floor of her cottage bedroom. Grace's body was lying next to the bed, parallel with the longitude of the bed, but with her head pointing toward the foot of the bed. Grace's cane was on the floor near her head.

---

2      Because this appeal implicates the substantial evidence standard of review, we summarize the evidence and state the relevant facts in the light most favorable to the judgment. (*People v. Jennings* (2010) 50 Cal.4th 616, 638 (*Jennings*).)

3

Grace was lying on her back, naked from the waist down. A blanket had been placed over her, covering her from her head to her waist. Underneath the blanket, a pillowcase lay across her neck. Grace was still wearing a pajama top, but her pajama bottoms, underwear, and a bladder control pad were on the floor next to her body. Her knees were bent and her legs were splayed open. A pillow, unsheathed from its pillowcase, had been placed over her pudenda. Her face was mottled with scrapes and bruises.

The contents of Grace's purse, including a Wheelchair Transport receipt with a service date of May 18, 1987, had been emptied onto her bed. A second pillow, also without a pillowcase, was on the bed. Grace's coin purse had been opened and overturned. A bottle of prescription pain medication had been uncapped and emptied. A storage box had been pulled from under the bed and opened. A large knife and a long-handled flashlight were discovered in Grace's bedroom; Betty testified they did not belong there. The television in the living room was on. In the kitchen, two gas burners on the right side of the stove were aflame.

It appeared to San Diego Police Department homicide detectives that Grace had been sexually assaulted and murdered. A homicide team evidence technician photographed the crime scene and collected physical evidence. Detective James Clear lifted a latent fingerprint from the chrome molding on the right side of the stovetop.

2. *Evidence of the Cause of Death*

Grace's body was transported to the coroner's office and autopsied. The coroner who performed the autopsy was deceased by the time of Ford's trial. Dr. Glenn Wagner, chief medical examiner for San Diego County, reviewed the autopsy report, crime scene photos, autopsy photos, and specimen slides. He testified at trial about the condition of Grace's body when it was

4

discovered and opined as to the origins of Grace's wounds and the cause of her death. The autopsy photos were shown to the jury, and Wagner discussed them as he testified.[3]

Grace was determined to be four feet eleven inches tall and 130 pounds at the time of her death. Among her documented conditions was a bed sore she had developed on her sacrum, indicating she spent a great deal of time in a seated or lying position. She had lost all of her teeth and had a full set of dentures in her mouth when she died. Grace's vagina was abraded, contused, and visibly bloody. A vaginal swab revealed the presence of full, intact spermatozoa.

The pillowcase draped across Grace's neck was loosely positioned and did not appear to Dr. Wagner to have been used as a ligature. Grace's hyoid bone, which attaches to the tongue, was intact. Her larynx and thyroid cartilage were hemorrhaged, indicating her airway had been compressed, but they were not fractured. Wagner testified that it takes 33 pounds of pressure to compress a human airway. He explained that when people are strangled, they get petechiae, or small hemorrhages, in the eye. Grace had no petechiae in her eyes, but she did have petechiae on the skin and surface of her face.

Grace's face was covered in bruises and abrasions. These wounds were distributed on the raised areas, and not the recessed areas, of Grace's face. Dr. Wagner explained that "if you were to walk into a wall or put your hand over your face, the areas that are injured are the areas that we see that you would have contact with." There was a pattern of horizontally-oriented abrasions and contusions across the bridge of Grace's nose. The outside and

---

[3] Pursuant to California Rules of Court, rule 8.224(d), we directed the superior court to send the trial exhibits, including the autopsy photos, to this court.

inside of Grace's lips were deeply bruised. Her chin was bruised and abraded. Grace's lower denture plate had been displaced from her gums and had flipped upside down in her mouth. There were recent curvilinear injuries below Grace's left ear that looked to Wagner like fingernail marks, although he was unable to determine whether the marks were caused by Grace, her perpetrator, or both.

The coroner had dissected Grace's scalp, which revealed multiple hemorrhages scattered across the inside of the scalp at the back of Grace's head. Dr. Wagner testified that the scattered but separated distribution of these contusions "represent[ed] blunt force injuries to the scalp as the head is going back and repeatedly impacting what I believe to be the floor." Grace's brain and lungs were swollen. He testified that all of the injuries had been inflicted at or around the time of Grace's death and were related to the cause of her death.

Dr. Wagner opined that there had been an act of violent sexual intercourse. The presence of full, intact sperm cells "suggest[ed] that [the] intercourse and . . . exchange of fluids was fairly recent" and happened close in time to Grace's death.

Directly addressing the cause of death, Dr. Wagner indicated that Grace had died by asphyxiation. Although he believed the evidence showed that Grace's neck had been subjected to sufficient pressure to compress her airway, because her hyoid bone remained intact he did not believe Grace had been strangled. Instead, Wagner was of the opinion that Grace's death was "an asphyxia death by suffocation and/or choking." He stated these two forms of asphyxiation were "linked," with "the primary mechanism for [asphyxiation] being the displaced dentures." He interpreted the medical evidence as indicating that Grace had been subjected to "a series of blunt

6

force injuries, which are abrasions and contusions and lacerations focused over the facial areas and were severe enough that there [was] motion, and it displace[d] a denture, not just knocking it off of the gums, but actually flipping it.  And that means it [became] an obstruction, just like eating a steak or a hot dog and [choking] on it."

Dr. Wagner responded to a series of questions by the prosecutor:

"Q.    And the injuries that we see to [Grace's] face, would that be the mechanism of either maybe the pillow or the pillowcase being put over her face and her being basically smothered?

"A.    Yes.  That would be that.  That is an external exclusion.  But even if that is happening -- and there is pretty good evidence of that -- something, whether it is a hand, a pillow, or something that we have not identified -- keep in mind that she also has an internal one with that denture being displaced.  Because you can't breathe through something solid.  And everything going to the lungs has to come down the airway.  And if the airway is obstructed, the lungs start getting fluffier and fluffier because they are trying to expand against pressure. . . .  And on the lung sections, they show hemorrhage in that.  [¶]  So this is not a 30-second death.  This is a several-minute death.  And it is one that, essentially, the oxygen is deprived for a long enough time for the heart to fail and the brain to swell.

"Q.    And that is from the smothering?

"A.    Correct."

Wagner added that the wounds on Grace's face were evidence "something [was] placed over the head or the face.  Doing what?  Obstructing the nose and the mouth, which is how you breathe."

Dr. Wagner agreed with the prosecutor's theory that "the abrasions [could have been] caused when that item or items [were] placed over her face,

7

[and she] struggl[ed] to resist that smothering[.]" He added, "you've [also] got all the bruises on the back of the head. Her head is bouncing, not once or twice, but a number of times, which I would interpret as effort to struggle. [¶] And the scratches to the side of the neck, which suggest you are trying to get something away from your neck, not reaching in your mouth. You could pull the dentures out if that were the case, but you're not able to do that for whatever reason." Wagner also agreed with the prosecutor that "all of these injuries -- the evidence of the sexual assault, the evidence of smothering, [and] the evidence of choking -- all occurred at or near the time of [Grace's] death[.]"

At the conclusion of his direct examination, Dr. Wagner provided the following summary of his cause-of-death opinions: "[c]ollectively, I have to come to the conclusion this is an asphyxia death by suffocation or blockage of the airway. Whether you want to call that choking or suffocation, it is the same term. And, in this case, is challenged by an internal, the displace[ment] of the denture, as well as physical obstruction of the nose and the mouth. And tied to that is all the other injuries you saw, the head bouncing back and what I am interpreting as evidence of sexual assault."

On cross-examination, Dr. Wagner agreed with defense counsel that for Grace's lower denture to become displaced and inverted, pressure had to have been applied to her mouth at an upward angle, which could have been caused by a person leaning on Grace's face. He also agreed with defense counsel that the abrasions on Grace's nose were consistent with abrasions caused by cloth or some other object placed over her face as she turned her head, which he said was "an important point." He referred to an autopsy photo that depicted prominent, bright-red, horizontally-oriented abrasions across the center of the bridge of Grace's nose. Referring to this photo, Wagner commented,

8

"Notice that there are two [abrasions], but they are linear. And this is a motion that is going right to left or left to right, not front to back."

At that same time, Dr. Wagner rejected defense counsel's theory that Grace's injuries were consistent with someone holding Grace's mouth and pressing her head into the floor as part of the sex act. He explained that the hemorrhages on the rear of her head were evidence of separate blunt force impacts, which were inconsistent with her head having been pressed into the floor. He reiterated that there were "several components" to Grace's death: "[t]here is the head striking, the blunt force injuries," "the displace[ment] of the denture, an internal blockage, and evidence of an external."

### 3. *Investigation and Arrest*

The initial investigation into Grace's death focused on the fingerprint evidence and the blood type of the semen contributor. Homicide detectives also reviewed crime reports of similar offenses for clues that might lead to the perpetrator. Ultimately, however, these efforts yielded no leads, and the case went cold.

In 2003, advances in the forensic use of DNA evidence led law enforcement to reopen Grace's case and cause a DNA profile to be generated for the sperm cells on the vaginal swab. The resulting DNA profile was entered in the national Combined DNA Index System, but the entry yielded no hits. In 2007 or 2008, Anthony Johnson, a cold case homicide investigator employed by the San Diego Police Department and later by the San Diego District Attorney's Office, entered the fingerprint evidence in a national law enforcement fingerprint database. No matches were discovered at that time.

In 2018, crime scene fingerprint evidence was reentered into the national database. This time, the system reported a match between the latent fingerprint lifted from the stovetop of Grace's cottage and fingerprints

9

taken from Ford in 2015 when he was arrested for a minor offense in North Carolina. Investigator Johnson ran a background check of Ford and discovered that Ford had lived in San Diego in the 1980's. Johnson contacted an investigator in North Carolina, and on June 13, 2018, they served Ford with a search warrant authorizing them to procure Ford's DNA sample.

After complying with the search warrant, Ford agreed to be interviewed by Investigator Johnson. Johnson told Ford he was investigating the 1987 murder of a San Diego woman, and that Ford's fingerprint had been found in her home. Ford responded that he was once employed by Wheelchair Transport, and that the job involved going into "old folks['] homes." This statement caught Johnson's attention, because he had not told Ford the murder victim was elderly. However, Ford denied having any recollection of Grace, and when Johnson showed Ford photos of Grace's residence, Ford claimed he did not recognize it. When Johnson asked Ford how his fingerprint could have come to be on Grace's stove, Ford speculated that he might have leaned on the stove to get his balance while he was working for Wheelchair Transport.

Subsequent testing revealed that Ford's DNA matched the DNA in the sperm portion of the 1987 vaginal swab sample. The likelihood such a match could occur at random within the Caucasian population was one in 290 quadrillion.

David Cornacchia, the prosecution's forensic biology expert, testified that the non-sperm portion of the vaginal swab sample contained DNA from three individuals, with Grace contributing 79 percent, Ford contributing 20 percent, and an unknown individual contributing one percent. The sperm portion of the vaginal swab sample was determined to contain DNA from two individuals, with Ford contributing 99 percent and an unknown individual

10

contributing less than one percent. The computer software used to calculate the relevant statistical probabilities determined that the DNA from the unknown individual had likely been introduced into the sample by environmental contamination.

Ford was arrested in North Carolina on July 11, 2018. Two days later, he called his wife, Betty Sue, from jail on a recorded line. Betty Sue said, "I got a feeling you know [*sic*] that all the time that they were coming to get you." Ford responded, "I was, I was prepared for it, yeah. I was ready for it, just in case. But I didn't know, I didn't know how good their evidence was. But we need to quit talkin' about that."

B.  *Defense Case*

1.  *Ford's Trial Testimony*

Ford testified at trial that he was born on January 8, 1956, and was originally from North Carolina. He was discharged from the Army at age 20, and in 1977 moved to National City, where he met and married his first wife, Angelina. But Ford had a drug problem. His drugs of choice were marijuana and powder cocaine. By 1986, Angelina had divorced Ford, and he went through periods of homelessness.

In November 1986, he was hired to work as a driver for Wheelchair Transport. Grace was one of his regular clients. Ford drove Grace to and from medical appointments more than half a dozen times. He would typically enter her residence through the back door and roll the wheelchair to Grace's bedroom or to her chair in the living room. Grace would then get in the wheelchair, and Ford would wheel her to the van. Ford got to know Grace quite well during this time; they shared an affinity for Ronald Reagan, and she liked his singing voice.

On May 18, 1987, Ford drove Grace home from a medical appointment and wheeled her into her bedroom. After she got into her bed, Grace patted the mattress next to her and asked Ford to sit down and spend time with her. Ford found this "uncomfortable" because he was not sure whether Grace was inviting a sexual encounter. Ford told Grace that he needed to get back to work, and he left.

Near the end of his workday on the following day, May 19, Ford obtained cocaine from a dealer who "fronted" the drugs to Ford because he lacked the money to pay for them. Ford promised to pay the dealer when he got his next paycheck. Ford used the drugs at around 6:30 p.m. while parked in his van on University Avenue. Cocaine tended to cause Ford to crave sex, and it had that effect on this occasion. Although Ford sometimes frequented prostitutes, he was unable to do so this time because he had no money. He remembered "the previous evening when [Grace] made that offer." Although Grace did not mention sex, "[s]he alluded to it."

Ford drove to Grace's cottage. He arrived at around 7:00 p.m. and knocked on her back door. Grace approached, balancing herself against a door jamb, and opened the door. Ford presented his elbow, and the two made their way to the bedroom. Grace sat on the side of her bed, removed her underwear, and the two engaged in consensual sex. Ford did not grab Grace's throat or cover her face. When he last saw Grace, she was alive and well.

A few days later, Ford learned from his boss that Grace had been killed. He did not reveal his sexual encounter with Grace because it was against company policy and would have placed him at the scene of the homicide. In June of 1987, he was fired from Wheelchair Transport when it

12

was discovered he was sleeping in his work van. A few months later, he left San Diego and moved to the state of Washington.

Ford testified that when he was interviewed by Investigator Johnson, he did not initially recognize Grace's name or the photos of her home. Once he realized who Grace was, he did not tell Johnson he knew her because it would have placed him at the scene of the crime.

### 2. Defense Investigation

A defense investigator was assigned to the case in 2018. He learned that Wheelchair Transport had been dissolved in 1997 and the owners and any coworkers Ford could recall were all deceased. The investigator also determined that while Grace's address book of personal contacts was included with the evidence collected during the original investigation, the individuals in the address book were deceased or the phone numbers no longer worked. Apart from the autopsy and toxicology reports prepared in 1987, the investigator was unable to obtain any other medical records for Grace.

### 3. Rape Series

During the original investigation into Grace's murder, detectives pursued a number of leads to no avail. In particular, they looked into a series of five rapes of elderly women that had taken place between August and October of 1987 in the same general neighborhood where Grace lived. Several of the victims reported that the assailant had been armed with a knife, had grabbed their mouths so tightly that it injured them, and had stolen valuables from them. Two victims reported that after they were raped, the perpetrator threw a blanket over them. There was evidence that most of the rapes had been committed by a Black male, which excluded Ford as the potential perpetrator. All biological evidence collected during the investigation of this rape series had been purged.

13

### 4. *Testimony of Angelina*

Angelina, Ford's first wife, testified that she met and married Ford in 1977 and divorced him in 1985. She last saw Ford in 1987 and did not see him again until she visited him in jail after he was arrested for the murder of Grace. Angelina stated that she never saw Ford act violently or aggressively toward anybody. She did not believe Ford was capable of raping and murdering Grace, nor did she believe Ford, as a 31-year-old man, would have had intercourse with a 79-year-old woman.

### 5. *Testimony of Forensic Psychologist*

A defense clinical psychologist testified that people can maintain sexual interest as they age, and that 26 percent of people aged 75 to 85 remain sexually active. He also testified that stimulants, such as cocaine, can increase sexual interest, but do not generally cause psychotic behavior.

## DISCUSSION

### 1. *Sufficiency of the Evidence to Find a Specific Intent to Kill*

On appeal, Ford acknowledges the evidence at trial established that it was he who sexually assaulted Grace. He maintains, however, that we must reverse the jury's true findings as to the felony-murder special circumstance allegations because the evidence at trial was insufficient to support the inference that he acted with a specific intent to kill.

Specific intent to kill was an element of felony murder at the time of Grace's homicide. In 1983, the California Supreme Court decided *Carlos v. Superior Court* (1983) 35 Cal.3d 131 (*Carlos*), in which it "construed the statutory provision defining the felony-murder special circumstance (§ 190.2, subd. (a)(17)) as requiring an intent to kill, whether the defendant was the actual killer or an accomplice." (*People v. Bolden* (2002) 29 Cal.4th 515, 560.) In October 1987, our high court overruled *Carlos* in *People v. Anderson* (1987)

14

43 Cal.3d 1104, "holding that intent to kill was not a requirement for an actual killer." (*Bolden*, at p. 560.) "For crimes committed during the so-called window period between those two decisions, however, intent to kill continues to be a requirement for the felony-murder special circumstance." (*Ibid.*) Because Grace was killed in May 1987, during this window period, the felony-murder special circumstances with which Ford was charged required proof Ford acted with specific intent to kill.

The mental state of specific intent to kill is "coincident with express malice." (*People v. Guerra* (1985) 40 Cal.3d 377, 386.) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' " (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).) "Express malice requires a showing that the assailant ' " 'either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' [Citation.]" ' " (*Ibid.*)

When a defendant claims the evidence at trial was insufficient to support the verdict, the appellate court "review[s] the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) In undertaking this review, "we presume in support of the judgment ' "the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Nelson* (2016) 1 Cal.5th 513, 550.)

Appellate review of the sufficiency of the evidence of a defendant's mental state is guided by the reality that " '[t]here is rarely direct evidence of a defendant's intent.' " (*Smith, supra*, 37 Cal.4th at p. 741.) Instead, " '[e]vidence of a defendant's state of mind is almost inevitably circumstantial . . . .' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)

Intent to kill may, therefore, "be inferred from [a] defendant's acts and the circumstances of the crime." (*Smith*, at p. 741.) Evidence of a motive to kill may also be probative of a specific intent to kill, although "[o]ne may kill with or without a motive and still be found to have acted with express malice." (*Id*. at pp. 741-742.)

Ford's sufficiency of the evidence challenge focuses on Dr. Wagner's testimony, which he asserts failed to establish a manner of death from which the jury could properly infer specific intent to kill. Ford claims that Wagner's testimony demonstrated only that Grace's asphyxiation death resulted from her lower denture plate becoming displaced during the sexual assault, which he contends supports no more than an inference of an accidental death. He notes that Wagner did not conclude that Grace died of strangulation.

Ford further maintains that Dr. Wagner's testimony on the topic of Grace's suffocation was speculative. He bases this contention on an exchange that occurred between the prosecutor and Wagner on direct examination. The prosecutor asked, "And the injuries we see to her face, would that be the mechanism of either maybe the pillow or the pillowcase being put over her face and being basically smothered?" Wagner responded, in part, that "even if that is happening -- and there is pretty good evidence of that -- something, whether it is a hand, a pillow, or something that we have not identified -- keep in mind that she also has an internal one with the denture being displaced. Because you can't breathe through something solid."

Ford highlights the prosecutor's use of the word "maybe," and Dr. Wagner's statement "even if that is happening," and essentially contends these were words of equivocation indicating that Wagner was speculating when he opined that Grace was asphyxiated by any means other than the dislodged denture. Ford further maintains that the quoted testimony

16

established nothing more than a mere "possibility" that Ford used his hand, a pillow, or something else to smother Grace, making it speculative and therefore insufficient to support the inference that she was killed intentionally.

We reject Ford's characterization of Dr. Wagner's opinion testimony as speculative. Ford relies on a narrow segment of Wagner's direct examination, ignoring the remainder of his testimony in which he opined, without equivocation, that Grace had been smothered by an object used to block her nose and mouth. He further explained how Grace's injuries provided evidence of external asphyxiation.

To succeed on a substantial evidence challenge, an appellant "must set forth in his opening brief *all* of the material evidence on the disputed elements of the crime in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.) "If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the jury's verdict may lie in the evidence he ignores." (*Ibid.*) Ford's failure to acknowledge all of Dr. Wagner's testimony, including the testimony that does not favor his position, is itself a basis for rejecting his claim that insufficient evidence supported the verdict.

In any event, we disagree with Ford's contention that Dr. Wagner was speculating in the quoted passage when he testified that Grace was smothered. Speculation is a conclusion reached without a foundational showing. (See, e.g., *People v. Morris* (1988) 46 Cal.3d 1, 21 [explaining, in setting forth the principles applicable to a sufficiency-of-evidence analysis,

that "[a] reasonable inference . . . 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work . . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.' "], disapproved on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5.) In the passage of testimony on which Ford relies, Wagner stated there was "pretty good evidence" Grace was smothered, which indicates there was sufficient foundational support for this opinion. The prosecutor's use of the word "maybe," and Wagner's own equivocation, related to the precise object used to smother Grace, as opposed to whether she was smothered at all. However, Wagner's inability to identify the object with which Grace was smothered does not justify overturning the verdict, because the precise instrument used to accomplish the homicide was not a material element of the offense. (See, e.g., *People v. Cervantes* (2001) 26 Cal.4th 860, 866 [substantial evidence review focuses on whether the trier of fact "could have found the essential elements of the crime beyond a reasonable doubt"].)

Moreover, in the passages of testimony Ford ignores, Dr. Wagner repeatedly opined that Grace had been suffocated. He did so with certainty, and he identified the medical evidence supporting his opinion. He stated on direct examination, for example, that Grace's facial injuries were consistent with something being placed over Grace's head or face, "[o]bstructing [her] nose and . . . mouth, which is how you breathe." He observed that the horizontal orientation of the wounds, together with the hemorrhages on the back of Grace's head and the wounds consistent with fingernail marks on her neck, were collectively indicative of a struggle to resist being smothered by an item placed over her face.

18

When summarizing his cause-of-death opinions, Dr. Wagner testified that Grace had died of asphyxiation, which "in this case, is challenged by an internal, the diplace[ment] of the denture, as well as the physical obstruction of the nose and the mouth." He agreed on direct examination that "the evidence of smothering, [and] the evidence of choking -- all occurred at or near the time of [Grace's] death," and on cross examination, he reiterated that there were "several components" to Grace's death, which included "the displace[ment] of the denture, an internal blockage, and evidence of an external." In short, Ford's contention that Wagner's opinion that Grace was smothered relied on speculation does not withstand scrutiny.

Nor is the jury's verdict undermined by the fact that Dr. Wagner identified asphyxiation by choking on the denture plate as the "primary" cause of Grace's death. "When there are concurrent causes of death, the defendant is criminally responsible if his or her conduct was a substantial factor contributing to the result." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1009.) " '[A]s long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes was the principal or primary cause of death.' " (*Jennings, supra*, 50 Cal.4th at p. 643.) Wagner testified that the smothering and choking "all occurred at or near the time of [Grace's] death" and that Grace's asphyxiation was "challenged by . . . the displace[ment] of the denture, as well as physical obstruction of the nose and the mouth." The jury reasonably could have inferred from this testimony that Ford's smothering of Grace was a substantial factor contributing to Grace's asphyxiation death.

Moreover, the evidence that Ford subjected Grace to forceful smothering, together with the circumstances surrounding Ford's commission of the crime, amounted to substantial evidence from which the jury could

19

properly infer that Ford acted with specific intent to kill. According to Dr. Wagner, the location of Grace's facial wounds evidenced that something, likely a fabric-covered object, was placed forcefully over Grace's face, obstructing her ability to breathe through her nose and mouth. The autopsy photos displayed to the jury as Wagner testified showed two bright red, horizontally-oriented contusion and abrasion wounds on Grace's nose. The lower of these was situated just below the center of the bridge of her nose and spanned the width of her nose and was visually the most prominent of the exterior abrasions on the surface of Grace's face. Wagner explained that the horizontal orientation of these wounds indicated movement, and the linear appearance of the abrasions suggested they were likely created by surface contact with fabric as Grace struggled against that fabric-covered object. The location of these wounds indicated the application of force over Grace's nose as well as her mouth, which is an act consistent with the intent to kill her by blocking her nasal and oral airways.

Adding to the inference of intent to kill was the presence of distinct, dark contusions on the rear of Grace's head. Because these wounds were distinct and localized, Dr. Wagner rejected the theory that they could have been caused by pressure being placed over Grace's mouth and pressing her head into the floor "as part of the sex act." Rather, it was his opinion that each contusion represented a unique blunt force injury created by a separate and distinct blunt force traumatic impact. On direct examination, he stated that these back-of-the-head contusions, together with the horizontally-oriented abrasions over the nose (indicating sideways movement), were evidence of a struggle to smother the victim. Although he later agreed on cross-examination that they might also be evidence of the victim's head

20

"bouncing" on the floor after a fall, the jury could properly credit the earlier opinion, which is consistent with an intent to kill.

The scratches on the side of Grace's neck were additional evidence supportive of the inference of external smothering. Dr. Wagner testified these scratches were consistent with the victim struggling to remove something placed over her mouth and neck to avoid being smothered.

Taken together, the evidence of facial wounds, head contusions, and neck scratches were consistent with Grace struggling against something pressed forcefully over her nose and mouth, blocking her nasal and oral airways. The evidence thus supported the inference that the perpetrator was engaged in a conscious effort to smother Grace, that Ford intentionally subjected her entire face—not just her mouth—to traumatic force, and that these efforts were not part of the sex act or from a desire to quiet her, but were rather designed to prevent her from breathing altogether.

The jury could reasonably determine that subjecting an elderly and frail victim to forceful smothering and blunt force head injuries related to that smothering supported the inference of an intent to kill. The age and frailty of a rape-murder victim are relevant to discerning an intent to kill from the particular acts of violence perpetrated on the victim. (*People v. Osband* (1996) 13 Cal.4th 622, 682-683 (*Osband*).) In *Osband*, our Supreme Court emphasized the 66-year-old rape-murder victim's "elderly," "tiny," and osteoporotic state in finding that a stab wound in her neck was overwhelming evidence of an intent to kill such that the trial court's failure to instruct the jury on the need to find defendant acted with the specific intent to kill was harmless. (*Id.* at pp. 682-683.) The decedent here was four feet eleven inches tall—tiny, as in *Osband*—and 79 years old, older than the victim in *Osband*. Ford was in a position to observe Grace's poor mobility while

21

transporting her to and from medical appointments. As in *Osband*, the helplessness of the victim together with the evidence of the multiple blunt force traumas to which she was subjected during the struggle to block her external airways supports the inference Ford intended to kill Grace.

The evidence of the state in which Grace's body and possessions were discovered further supported the inference that her death was intentional. The condition in which a perpetrator leaves the victim's body, and the evidence of the perpetrator's conduct following the victim's death, may support the inference of an intentional homicide. (See, e.g., *Osband*, *supra*, 13 Cal.4th at pp. 653-654, 683; *People v. Perez* (1992) 2 Cal.4th 1117, 1128 (*Perez*).) In *Osband*, for example, the defendant draped a robe across the victim's shoulder and back, stacked dresser drawers on top of the robe, and then tossed clothing onto that pile, then dumped the contents of her purse on the bed and removed her television from the living room. (*Osband*, at pp. 653-654, 683.) The Supreme Court explained that "[t]he only reasonable inference is that defendant searched the apartment for valuables after attacking [the victim], safe in the knowledge that she would not interfere because she was either dead or dying." (*Id*. at p. 683.) Likewise in *Perez*, the court reasoned that "the conduct of defendant after the stabbing, such as the search of dresser drawers, jewelry boxes, kitchen drawers and the changing of a Band-Aid on his bloody hand, would appear to be inconsistent with a state of mind that would have produced a rash, impulsive killing. Here, defendant did not immediately flee the scene." (*Perez*, at p. 1128; see *People v. Potts* (2019) 6 Cal.5th 1012, 1028 ["Further, a jury could quite reasonably infer that a person who followed a horrific double homicide by opening a package of cookies was not surprised and dismayed by what he had done, as one who acted impulsively might be."].) Similarly, here, Ford's acts of

covering Grace's head and upper body with a blanket, searching through her purse and wallet, emptying her coin purse, emptying a medication bottle, and removing a storage box from under her bed in an apparent search for valuables were acts inconsistent with the state of mind of one who had just accidentally killed their victim.[4]

In sum, we reject Ford's contention that the manner-of-killing evidence was insufficient to support an inference that he acted with specific intent to kill. Dr. Wagner's opinion that Grace was smothered did not rely on speculation. In addition, the evidence that Ford smothered his elderly victim while subjecting her head to multiple blunt force traumas, together with the other factors we have discussed, provided substantial evidence from which the jury properly could infer that Ford intended to kill Grace.

---

[4]     The People argue that an inference of a deliberate homicide can also be derived from the fact Grace knew Ford, supplying him with a motive to kill Grace to avoid being identified and apprehended for the rape. Although we regard this as weak motive evidence, we acknowledge that the same reasoning has been adopted by other courts as a basis for inferring a motive to kill in the felony-murder context. (See, e.g., *People v. Bonillas* (1989) 48 Cal.3d 757, 792 ["Although there was no evidence of planning activity with respect to the killing, there was evidence of motive. The victim was defendant's neighbor and would easily have been able to recognize and identify defendant as the perpetrator of the burglary."]; *People v. Booker* (2011) 51 Cal.4th 141, 173-174 ["[A] trier of fact reasonably could have concluded that after defendant's initial incident with [the first victim], he murdered these two victims because they could identify him . . . ." and the victims' familiarity with the defendant supported this inference, "making it more likely they would be able to identify him"]; *People v. Shamblin* (2015) 236 Cal.App.4th 1, 13 ["[T]he jury could have inferred from the evidence of sexual assault at the murder scene (i.e., defendant's semen was in the victim's vagina and the victim had bruising on her upper thighs, including bruising in the inguinal area of her left thigh) that defendant's motive for strangling the victim was ' "to avoid detection for the sexual and other physical abuses he had committed against her." ' "].)

*2.*     *The Trial Court Erred in Denying Ford Presentence Credits*

At Ford's sentencing hearing, after the trial court sentenced him to life in prison without the possibility of parole, the issue of calculating presentence credits was raised.  The prosecutor advised the court that in 1987, pretrial detainees accrued presentence conduct credits at the rate of one-third actual time served, but then stated that Ford was not entitled to presentence custody or conduct credits because he had been sentenced to life without the possibility of parole.  The court accepted this representation and ruled that Ford would receive "zero [presentence] credits."  The "credit for time served" section of Ford's abstract of judgment reflects zero days of credit for actual time served and zero days of local conduct credit.

Ford challenges the trial court's refusal to grant him credit for actual time served in presentence detention or for the conduct credits he earned during this period.  He argues that even a defendant sentenced to a term of life without the possibility of parole is entitled to credit for actual time served.  He further maintains that he is not barred from receiving conduct credits, and that under the version of section 4019 in existence when his offense was committed, he was entitled to conduct credits of two days for every four days of actual time served.  He asserts that applying this formula to his actual presentence custody time of 521 days leads to the conclusion he was entitled to 260 days of presentence conduct credits, for a total of 781 days in presentence credits.

In their response brief on appeal, the People initially asserted that because Ford was sentenced to life without the possibility of parole, his entitlement to presentence credits was a moot issue the merits of which they would only address upon request.  We issued an order directing the People to submit a supplemental brief discussing the merits of Ford's challenge.  In

24

their supplemental brief, the People agree Ford is entitled to presentence custody and conduct credits, and they indicate that the abstract of judgment should be modified to grant Ford 521 days of presentence custody credits and 260 days of presentence conduct credits.

Having independently reviewed the issue, we conclude the trial court erred and will modify the judgment to include presentence custody and conduct credits in the amounts indicated by the parties.[5]  First, Ford's life without the possibility of parole sentence did not disqualify him from receiving credit for the actual time served in presentence detention.  Section 2900.5 governs entitlement to actual credit.  (*People v. Brown* (2020) 52 Cal.App.5th 899, 903, fn. 2 (*Brown*).)  Subdivision (a) of section 2900.5 provides that "*[i]n all felony and misdemeanor convictions*, either by plea or by verdict, when the defendant has been in custody, including, but not limited to, any time spent in a jail, camp, work furlough facility, halfway house, rehabilitation facility, hospital, prison, juvenile detention facility, or similar residential institution, all days of custody of the defendant, including days served as a condition of probation in compliance with a court order, credited to the period of confinement pursuant to Section 4019 . . . *shall be credited upon his or her term of imprisonment . . . .*"  (Italics added.)  Case law is in accord that section 2900.5 grants "all defendants" presentence custody

_____

[5]     Ford's counsel did not object to the trial court's ruling.  Ford argues the issue is not forfeited because his attorney's failure to interpose an objection served no legitimate tactical purpose, and he was thereby rendered ineffective assistance of counsel.  We agree his counsel's performance was deficient in this regard and we therefore grant relief.  (See, e.g., *People v. Martinez* (2014) 226 Cal.App.4th 1169, 1190 [correcting erroneously-imposed restitution fund fine despite trial counsel's failure to object to the fine at sentencing, where counsel's performance was deficient because there was no conceivable tactical reason for counsel's failure to object].)

credits.  (*People v. Herrera* (2001) 88 Cal.App.4th 1353, 1366.)  Courts have modified judgments to correct miscalculations of presentence credits even in cases in which the defendant was ineligible for parole.  (*People v. Chism* (2014) 58 Cal.4th 1266, 1336-1337 (*Chism*) [capital case, affirming judgment of death but directing superior court to modify judgment to reflect that defendant was entitled to 96 days of presentence conduct credit]; *People v. Johnson* (2010) 183 Cal.App.4th 253, 288-289 [affirming the judgment of conviction of a defendant convicted of felony murder and sentenced to life without the possibility of parole, but holding the trial court erred in failing to award the defendant credit for actual time served in presentence custody under section 2900.5].)  Accordingly, we will modify the abstract of judgment to reflect the accumulation of 521 days of presentence custody credits under section 2900.5.[6]

Second, Ford's life without the possibility of parole sentence did not render him statutorily ineligible to receive presentence conduct credits.  (See *Brown*, *supra*, 52 Cal.App.5th at p. 903 [noting that sections 2933.1 and 2933.2 operate to restrict or eliminate presentence conduct credit].)  Although section 2933.2 bars convicted murderers from receiving conduct credits, it

---

[6]    In their supplemental brief, the People appear to have abandoned their initial contention that the trial court's sentencing error was a moot issue, but they did not expressly withdraw it.  To the extent the People continue to advance this position, we reject it.  "A case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief."  (*Californians for Alternatives to Toxics v. Department of Pesticide Regulation* (2006) 136 Cal.App.4th 1049, 1069.)  Here, we cannot say that correcting Ford's presentence credits will be of no practical effect.  Although we do not disturb his life without the possibility of parole sentence, until his rights of appeal and habeas corpus are fully exhausted, the possibility of an alteration in his sentence exists.  If Ford is ever resentenced, the proper crediting of his time in presentence detention may become important.

does not apply in Ford's case because Ford committed his offense before the effective date of the statute. (See § 2933.2, subd. (d) ["This section shall only apply to murder that is committed on or after the date on which this section becomes operative."]; *People v. Ly* (2001) 89 Cal.App.4th 44, 47 [section 2933.2 became effective on June 3, 1998].) And while section 2933.1 limits the rate of accrual of conduct credits by defendants convicted of violent felonies, it is likewise inapplicable here because Ford's offense preceded its enactment. (§ 2933.1, subd. (d) ["This section shall only apply to offenses listed in subdivision (a) that are committed on or after the date on which this section becomes operative."]; *People v. Palacios* (1997) 56 Cal.App.4th 252, 256 [section 2933.1 became effective on Sept. 21, 1994].)

Presentence conduct credits are authorized by section 4019. (*Brown*, *supra*, 52 Cal.App.5th at p. 903.) The only question that remains is whether Ford's conduct credits should be calculated under the version of section 4019 in existence in 1987, when he committed his offense, or the version in existence in 2018 and 2019, when Ford was being held in pretrial detention.[7] Both parties have asserted that the prior version of section 4019 governs this determination. We agree, although for a slightly different reason than is suggested by the parties.

Ford asserts that the law on conduct credits in effect in May 1987 must be applied to avoid an ex post facto violation. However, an ex post facto violation arises only where a new penal statute *disadvantages* a defendant. (*Weaver v. Graham* (1981) 450 U.S. 24, 29.) In this case, after Ford committed his offense, section 4019 was amended effective October 1, 2011, to grant conduct credits at a more generous rate than under the older version of

_____

7    Ford was arrested on July 11, 2018 and sentenced on December 13, 2019.

the law.  (Compare § 4019, former subd. (f), Stats. 1982, ch. 1234, § 7, p. 4554 [giving detainees six days of credit for every four days spent in actual custody], with § 4019, former subd. (f), Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 12, § 35 [giving detainees four days of credit for every two days spent in actual custody].)  Thus, no ex post facto problem would be created by calculating Ford's conduct credits under the more recent versions of the statute.

Both parties cite *Chism* in support of the notion that the 1987 version of section 4019 governs Ford's entitlement to conduct credits.  While the result in *Chism* is certainly consistent with that conclusion (*Chism*, *supra*, 58 Cal.4th at p. 1336 [conduct credits "are governed by former section 4019" because defendant committed his crimes in 1997]), the opinion focuses on the inapplicability of section 2933.2 and its prohibition on conduct credits for persons convicted of murder.  As we have noted, determining that section 2933.2 does *not* apply still leaves undecided the question which version of section 4019—pre-2011 or post-2011—*does* apply.

We nonetheless agree with the parties that Ford's conduct credits should be calculated under the law in existence when he committed the offense, a result compelled by the language of section 4019 itself.  On the date of Ford's arrest, and continuing through the date of his sentencing, section 4019, subdivision (h), provided that "[t]he changes to this section enacted by the act that added this subdivision shall apply prospectively and shall apply to prisoners . . . for a crime committed on or after October 1, 2011.  Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law."  (§ 4019, subd. (h), as amended by Stats. 2016 ch. 706 § 3 (SB 266), eff. Jan. 1, 2017, repealed Jan. 1, 2021; Stats. 2018 ch. 1008 § 5 (SB 1187), eff. Jan. 1, 2019, repealed Jan. 1, 2021.)  Courts have held that

this language reflects a legislative intent that the enhanced rate for accrual of conduct credits authorized by the corresponding versions of section 4019 apply only to those defendants who committed their crimes on or after October 1, 2011.  (See, e.g., *People v. Ellis* (2012) 207 Cal.App.4th 1546, 1553; *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 47-52.)

Thus, because of the limitation in subdivision (h) of section 4019, we must look to the version of section 4019 in effect when the crime was committed.  We agree with the parties that in May 1987 conduct credits accrued at a rate of six days of credit for every four days spent in actual custody (§ 4019, former subd. (f), Stats. 1982, ch. 1234, § 7, p. 4554), and that under this formula, Ford was entitled to 260 days of presentence conduct credits.

Accordingly, we will modify the judgment to reflect that Ford accumulated a total of 781 days of presentence credits, consisting of 521 days of actual credits and 260 days of conduct credits.

3.     *The Court Erred in Imposing a $300 Restitution Fine Under Section 1202.4*

At sentencing, the trial court indicated it would impose the minimum restitution fine under section 1202.4, subdivision (b), which it stated was a "minimum of $300, I think, for a felony . . . ."  The abstract of judgment reflects a restitution fine of $300 under section 1202.4.

Ford contends this fine should be reduced.  He argues that the statutory minimum restitution fine was lower when the underlying offense was committed, and that the court's imposition of a higher minimum restitution fine violates the prohibition against ex post facto laws.  The People agree that Ford's fine should be reduced to reflect the minimum restitution fine available under the law in effect in May of 1987.  We agree with this position as well.  (See *People v. Gaynor* (2019) 42 Cal.App.5th 794,

805 ["In imposing a restitution fine, a trial court is required to apply the statute 'in effect when [an] appellant committed his crimes.' "].)

Both sides initially asserted that in May 1987 the relevant statutory minimum restitution fine was $200. However, our own research indicates that the statutory minimum at that time was actually $100. (See § 1202.4, former subd. (a), added by Stats. 1983, ch. 1092, § 320.1, p. 4058 [stating in relevant part that "[i]n any case in which a defendant is convicted of a felony, the court shall order the defendant to pay a restitution fine as provided in subdivision (a) of Section 13967 of the Government Code"]; former Gov. Code, § 13967, subd. (a), Stats. 1986, ch. 1438, § 1, p. 5140 [stating in relevant part that if a "person is convicted of one or more felony offenses, the court shall impose a separate and additional restitution fine of not less than one hundred dollars ($100) and not more than ten thousand dollars ($10,000)."].) We solicited supplemental briefing from the parties to see if they agreed with our research; they did.

Accordingly, we will modify the judgment to reflect imposition of a restitution fine of $100 under section 1202.4.

4.    *The Trial Court Erred in Imposing a Parole Revocation Fine Under Section 1202.45*

Ford contends that because the trial court sentenced him to life without the possibility of parole, it erred by imposing a $300 parole revocation fine under section 1202.45, subdivision (a). The People concur with this position, as do we. "A parole revocation fine may not be imposed for a term of life in prison without possibility of parole, as [section 1202.45] is expressly inapplicable where there is no period of parole." (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 819.) We will modify the judgment to strike the parole revocation fine erroneously imposed under section 1202.45.

## DISPOSITION

The judgment is modified in the following respects: (1) to reflect that Ford accumulated 521 days of actual credits and 260 days of conduct credits, for a total of 781 days of presentence credit for time served; (2) to reflect that the amount of Ford's restitution fine under section 1202.4 is $100, not $300; and (3) to strike the $300 parole revocation fine imposed under section 1202.45. As modified, the judgment is affirmed.

DATO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.